The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oyez, oyez, oyez, all persons having any manner or form of business before the Honorable, the United States Court of Appeals for the Fourth Circuit, are admonished to draw nigh and give their attention, for the Court is now sitting. God save the United States and this Honorable Court. Thank you. Please be seated. Welcome to the Fourth Circuit. We're prepared to hear argument in our first case, which is Reed. And we have four counsel who will be arguing in that case. Is that right? All right. And Ms. Van Lowe, you're going to lead off. Okay. Well, since we have four people, and I'm sure they'd all like to have something to say, we'll hope that you watch your time and we will too. So we'll be glad to hear from you. Good morning, Your Honor. Melinda Van Lowe here representing Stanley Winston. I will be addressing generally for all the defendants on Issues No. 1 and Issue No. 2. In addition to that, my co-counsel who are also here representing their respective clients, Larry Woodward, Jr., Alfred Robertson, Jr., and Abram Pafford, will each be presenting arguments on their specific clients in that order. Which issues do you want to refer? The first issue deals with the Court's erroneous admission of Exhibit No. 45, which was a map that displayed each of the appellant's names. And Issue No. 2 deals with general sufficiency, and there are specific subparts to that as well, three subparts to that. With respect to the first issue, Exhibit No. 45, as Your Honors can see, we argued that the Court erroneously admitted that piece of documentation into evidence. Essentially, Exhibit No. 5 is a map that was presented by the government's final witness, who was an expert in historic cell site data. He plotted several points on the map that represented the trail of phone calls that had basically pinged off of certain cell towers. And then in addition to that, he labeled the names of the respective appellants across those trail of phone calls. Each of the calls of the trail had a color code, and then the appellant's names were listed over that color code. This was admitted in error because, first of all, the phones that he used to be able to label the map were not authenticated specifically to each of the defendants in the case. There was insufficient evidence beyond a reasonable doubt that the phones that he labeled and then attached a name to actually belonged to those specific defendants. Well, but he wasn't proffered to make that determination. He was simply proffered to establish the various pings with respect to these phones. But at that point in the trial, hadn't the government presented evidence, which you may argue is insufficient, but evidence tying the phones to each individual defendant? I agree, Your Honor, that he was proffered to testify specifically to the historic cell phone data. When the expert, however, actually presented the map and then testified that each of the defendants were part of a specific phone and that that phone was linked to the specific defendant, he was certainly going well beyond his proffer. Well, but I understood that he did that only for ease of reference and that the district court made clear that that sort of syncing of names to phones was something for the jury to independently decide in terms of the evidence that had preceded it. Your Honor, actually it would have been potentially acceptable for the phone numbers to be listed and that would have been potentially a way that… I understand that, but I think the reason why it was done with respect to the names was simply to avoid confusion. And the court made clear that it was for the jury to decide whether in fact the names lined up with the phones, not for this witness. In trying to ease the confusion, if that's what he was trying to do, the expert essentially summarized for the jury exactly which defendant was supposed to belong to which phone rather than having the jury actually make that determination for themselves. In terms of the evidence, we objected to that particular piece of evidence coming in because it was essentially akin to a summary that the government could have presented in their closing argument. Instead, what happened is that was actually admitted as evidence so that rather than the jury having to look through the rather voluminous telephone evidence that had been submitted, as Your Honor referenced, and trying to piece together which defendant belonged to which phone, instead they had this map that had these trails and the defendant's name next to it, which at that point in time essentially told the jury this phone belongs to this defendant. And oh, by the way, this defendant, not his phone, but this defendant was at the point of the robbery. And the… The expert didn't say that. The expert actually did… First, the government made it very clear that this was only plotting of phones, not plotting of actual individuals, until the expert then went on to testify about how the cell site data and the historic cell site data is an exact locator and that these phones are inextricably linked to individuals. And so, therefore, you can draw the inference that the location of the phone is therefore the location of the individual. And that kind of gets into the second issue, which is the sufficiency of the evidence argument. With respect to the first issue, whether the VVM, whether the government accurately or sufficiently proved that there was actual fruits of the robbery that belonged to VVM, Inc., the government did not do that. Specifically, the government put on evidence of different witnesses who testified to their respective businesses within that space. However, there were, as Your Honor saw within the transcript, several businesses. There was a purse shop. There was a phone card store. There was a phone card booth. There was a money exchange or cash checking booth. And there was no indication from any of the witnesses that the actual money that took… that was removed from the store actually came from VVM. In fact, to this day, we don't really have any idea from the record and the government's witnesses what VVM actually is. Secondly, Your Honor, there was insufficient evidence presented by the government that the guns traveled through interstate commerce. There were three cases that we cited that specifically discussed what evidence could show that guns traveled through interstate commerce, that A, the guns were manufactured in a certain place, including Germany and Japan in one case. In another case, that the guns where they're manufactured meant that they could not have been manufactured in the forum state. And lastly, there was one gun that was actually labeled Miami, Florida, and this was found in another location. You're saying that that's the only way to prove that element? It's not the only way, Your Honor, but in this particular case, there was absolutely no evidence. Well, wasn't there evidence indicating that the weapons were found in one of the defendants… in a home of one of the defendants in Maryland, and then weapons similar…described similarly to those were found in D.C. at the site of the robberies. Isn't that enough? Respectfully, Your Honor, no, because the operative word there is similar. In this particular case, we did not have any type of serial number, any type of identifying…any type of identifiers that matched those guns to the guns that were found in the house. They were based on rather generalized descriptions, and in the case of the one gun that had a magazine, that was a long magazine. That wasn't part of the actual gun, so there wasn't anything… The jury had sufficient evidence to conclude that the defendants committed the robberies, and some of them were committed in Virginia, I believe, and that they were found with weapons similar to that in another state or the District of Columbia. Yeah, I misspoke. I said Maryland, but it was D.C. Yes. Isn't that sufficient for the jury to infer that the weapons crossed an interstate governmental boundary? Respectfully, no, Your Honor. This was an evidentiary finding that the jury had to make beyond a reasonable doubt, and to simply say that a black handgun was in Virginia and we found black handguns in D.C. is insufficient to be able to support that evidentiary finding. Finally, with respect to the identity of these individuals, there was absolutely insufficient evidence to be able to identify my client as well as the three other defendants in this case as the actual individuals that performed the robbery. With respect to the DNA evidence, and I direct I think the case that is best on point and best applicable here is United States v. Bonner that specifically talks about a case with facts very similar to ours in which the court found that there was insufficient identification evidence to find that the defendants were at the robberies. I will now yield my time to my co-counsel. Thank you very much. Mr. Woodard? Yes, Your Honor. Good morning. May it please the court. Very quickly, on behalf of Mr. Reed, here's the evidence with regard to Mr. Reed. He was about an hour and 15 or 20 minutes after the third robbery walking down the street with three individuals in D.C. The police approached him. He ran. He's an African-American male. He ran into the woods, was later arrested. The government's theory against Mr. Reed was that he was the getaway driver in these robberies. Did he have a screwdriver on him? He did have a screwdriver on him, Your Honor. It could have been an implement. It could have been used to punch the locks on all those. They seemed to, whoever was doing the robberies, seemed to have an affinity for jeeps and punching the locks. He had a screwdriver on him that could have been used for that or any other of a thousand other things, Your Honor. There was no evidence in this case, one, that that screwdriver was used or two, that even a screwdriver was used to punch any of the locks. They found all of the stolen vehicles. There was no physical evidence to tie Mr. Reed to any of those vehicles. The cell phone evidence against Mr. Reed is that his phone was within, depending on which piece of evidence you want to believe, was within 3 miles to 5,000 meters of the locations of the various robberies. No one saw the getaway driver. No one, with the exception of one robbery I misspoke, saw the getaway driver, whether it was a man, woman, African American. If he was apprehended, was there cash around him? There was some cash around him but not on him, yes, Your Honor. There was cash in the wood around him. It wasn't real clear how close to him it was, but it was certainly the evidence, to be fair, was that there was some cash near him. No indication that that cash wasn't marked, didn't have dye on it, didn't have the GPS device. So I would submit to you, Your Honor, What about the DNA evidence? DNA evidence was that there was in the woods where he was near where he was found, there was a black stocking cap that had his DNA on it an hour and a half after one of the robberies. Wasn't there also a pair of gloves that were found with his DNA on it? Yes, sir. Again, that was an hour and a half after the third robbery, when he ran into the woods. And I won't quibble with the court. You've seen the record. They couldn't exclude him as being a source of the DNA. I mean, it wasn't necessarily his. It was no evidence of when it was. What about the fact that he was with the other three defendants at the time that the police encountered him? I see my time's up, but I'll answer your question, Your Honor. I think that that's meaningless. It's an hour and a half after the third robbery, and even if the court were to say that that somehow is proof beyond a reasonable doubt. Well, not in isolation, obviously, but in conjunction with the other evidence. There's certainly no evidence to indicate he was anywhere with them at the other two robberies. Anything else you want to tell us about your client? No, sir, Your Honor. I think that that covers it. As I said, what they have against him is he's walking down the street with these three guys, and that perhaps a phone that was his was within the vicinity. I mean, my phone's over in the Omni Hotel right now. I assume if somebody were to rob the Omni Hotel this morning, they could say that my phone was within a range of where the robbery occurred. So, again, cell phone evidence, I didn't try this case, I wasn't like Ms. Van Lowe, is very nonspecific. It shows where a device is, but not where a person is. All of us kind of came from an era where we didn't have cell phones for a long time, but at least I've observed that people below a certain age seem to be pretty much attached to their cell phones at all times. I've made the same observation with my daughters, Your Honor. All right. Thank you very much. Mr. Robertson? Thank you, Your Honor. I'm Alfred Robertson for Anthony Cannon. Your Honor, my main point that I wanted to make, and to be very precise with it, there was no evidence that my client had any of these phones. The phone number that they used, that they assigned to Mr. Cannon, they based that on the fact that one of the other phones that they had seized had Cannon in the contacts list and that phone number. That phone number, though, appears in other contact lists on some of the other phones for somebody entirely different, and there are other phone numbers for Mr. Cannon in the other phones that are numbers that they didn't even look at. It's hard to say which numbers are which, which numbers go to Mr. Cannon, which ones cover Mr. Cannon and where Mr. Cannon is. Mr. Cannon didn't even have a cell phone. They didn't even assign a cell phone to Mr. Cannon in one of the robberies at all. They state in their brief that the phone was turned off, was powered off, but they don't even really know that for sure. All they know is that there wasn't another. They only had two phones for one of the robberies, or three phones for one of the robberies instead of four. Assigning one of these phones to Mr. Cannon was inappropriate. It was speculation, pure speculation. It was pointed out to the trial court. It was pointed out that there were different phone numbers for Mr. Cannon, and yet they picked the one phone number that fits their theory of the case, and that's the phone number that they argue, ignoring the other exculpatory, what I would call exculpatory evidence of these other phones. I'm not saying they didn't give it to me. They gave them to me, and I argued it. But there wasn't enough evidence for the jury to find that that was Mr. Cannon's cell phone when you had all this other evidence that shows that he had different numbers. Even one of the... What about the GPS device from the Navy Federal robbery that was in his house, along with cash, guns, sea masks? The government argued that Mr. Cannon lived there. That was Mr. Cannon's mother's house. There were other males in that home when the police found my client walking down the street with Mr. Reed and the other defendants. There were other people in the house. There were other males in the house. They didn't secure the house. They saw these guys, and they zeroed in on these guys who were walking down the street. They didn't go and secure the house. They didn't go and look and see who else was in the house. We really can't even say that Mr. Cannon committed the Navy Federal robbery because his mother's house was where the guns and the money were found because there were other people in the house. And they know there were other people in the house because when they questioned one of the defendants, he said there were other people there when I got there. That same... By the way, in that same questioning, that same evidence that was brought into trial, that defendant said in the questioning, Anthony doesn't have a phone. Anthony doesn't have a cell phone at all. And, yes, maybe he's the one guy who doesn't have a cell phone, but Mr. Cannon did not have a cell phone in this case. He was signing a number. Did they also find ski masks and gloves and the like outside the house? And some of those items were tied to your client? They found it in a trash can, Your Honor. And, yes, some of that was found. But still, as Mr. Woodard pointed out, this is an hour and a half after the robbery when they're walking down the street. There's been nothing specific that said those were the masks, those were the gloves that were worn in the robberies. They find them, and they say, oh, well, this must be what it is. That's a big leap to make when you're talking about 60 years in prison. I submit, Your Honor. Thank you. Thank you very much. Mr. Pafford? May it please the Court, Abram Pafford for Appellant Tobias Dyer. I just have two points I'd like to make. First, with respect to the VVM robbery, Agent Horan testified in relation to Mr. Dyer's cell phone or his alleged cell phone that his phone clearly was not present at the scene of the robbery. And he testified to that effect on cross-examination based on the fact that he did identify the phone pinging off of a tower in Washington, D.C., on New York Avenue within 20 minutes of the time that the other defendant's phones were pinging on or near the location of the robbery. And so we would submit that once you have, for the first robbery, my client's phone definitively, by their own expert, testifying that it's not at the scene during the time of the robbery, that fractures not only their theory with respect to Mr. Dyer, with respect to the first robbery, but it fractures the rest of their case against Mr. Dyer, I think, because their entire case is built on the inference that these guys are always together and that you can associate these particular phones with particular individuals. Are you saying that the phone was pinging in Washington, D.C., at the time of the VVM robbery in Virginia? Is that what you're saying? I want to be precise, and all I'm trying to do is summarize what I believe was Agent Horan's testimony. Agent Horan, on cross-examination, was asked if in light of the fact that the VVM robbery took place at a certain time, and he had pinpointed that time in his analysis. And then he's asked, you have Mr. Dyer's phone over here pinging on New York Avenue in D.C. within 20 minutes of that. Doesn't that show that at the time of the robbery, 20 minutes earlier, his phone was not at the scene of the robbery? And Agent Horan's answer says, yes, clearly it was not there. I mean, the records show that it was not there, and we've quoted this testimony in our brief and the reply brief. And Agent Horan was admitted as an expert. I wouldn't have to accept that testimony, and neither did the jury, I don't think. But with respect to the sufficiency analysis, which has to consider all of the record evidence in the light most favorable to the government, certainly it is a piece of evidence. And the problem for the government is there is no countervailing evidence that would suggest that Mr. Dyer had anything to do with the VVM robbery. The rest of their argument is just built on trying to implicate him ultimately in the third robbery, the Navy Federal Credit Union, and then reverse engineer that to argue that it had to be the same group of individuals involved in the first two. And I think, frankly, if the court looks at the government's treatment of this argument in its response brief, it doesn't have a lot to say on this argument. And I think we did that analysis in the reply. Respectfully, one other point I'd like to make going to the third robbery, because they build so much of this on the Navy Federal Credit Union. With respect to Mr. Dyer, the key piece of evidence I think that the government got out of the circumstances of the arrest in the wake of the Navy Federal Credit Union robbery is a mask that has Mr. Dyer's DNA along with DNA of other individuals that is retrieved not from the woods where the arrest happens, but rather from the trash can outside of the house belonging to Mr. Cannon's mother. The significance there is that is on point the type of link that was rejected as legally insufficient in Bonner. In Bonner, there's a robber. He's seen with a Yankees hat. They do a search of the scene afterwards. A Yankees hat with the defendant's DNA is in the dumpster behind the restaurant. Here, there is a robbery with masks. Sometime hours later and miles away, there's a mask in a trash can that has traces of my client's DNA on it. Bonner is on point there. And, again, I think that's something where if one looks at what the government has said, they don't seem to have a lot to say in terms of distinguishing Bonner's holding that that type of extrapolation, especially when there are multiple individuals' DNA on the item, the item in the trash can doesn't prove that the item was at a particular place at a particular point in time sometime earlier. Well, the difference with Bonner was that that was the key piece of evidence. And here, at least, the government would say that's just one more piece of evidence tying your client and the others to be Bonner. I would respectfully submit that, and, again, we've done this analysis in the briefs, and the court has the benefit of that, but I would respectfully submit that, at least with respect to Mr. Dyer, if you start with the first robbery and say his cell phone's not there, then at the end we have the mask with his DNA on it and say, okay, that really doesn't count for much under Bonner, they don't have anything left, respectfully, other than a guilt by association inference that he knew these other individuals spent time with them and they were friends and they communicated frequently, and that, therefore, we can extrapolate that he was a participant in all the robberies. Final point I'll make with respect to that is when they make these generic arguments about the level of communication between the defendants, one of the things they did not do for Mr. Dyer, and, frankly, they didn't do it for any of the other defendants, is they never established a baseline. They said, hey, there's frequent telephone calls between these folks, but they never established a baseline of whether the frequency of the contact between and amongst the defendants was excessive in relation to the other numbers and the other contacts that one could extrapolate from the telephones. So without a baseline, I think it becomes even harder to make what is really, at least in my experience, this is, I think, the purest example of a guilt by association argument that I've ever seen, and we would submit that that is legally insufficient under a number of prior decisions that we've cited in the briefs. Okay. Thank you, Mr. Crapper. Thank you, Your Honor. Ms. Bellows? Good morning, Your Honors. I am Rebecca Bellows. I'm an assistant United States attorney, and I have the privilege of representing the United States in this matter. And I was one of the two prosecutors on this case, and so I'm very familiar with the record. And I was going to begin by summarizing a lot of the pertinent facts, but it's clear to me that all three of you have fully read the record and know all the facts. So what I'm going to do right now is just respond to some of the arguments that have been raised today. I want to begin with Mr. Pafford's argument that Agent Horan's, that was a cell site expert, that his testimony was that the phone was clearly not there. I agree that words to that effect were used by Mr. Horan, but I believe they were taken out of context. When you consider his whole testimony, where he goes through that Exhibit 45, what is clear, and if you also look at what was admitted in evidence, which were Mr. Dyer's cell phone records, there were no calls, there were no activities during the time of the robbery. Therefore, he could not say, Mr. Horan could not say where that phone was at the time of the robbery. What he did testify to, though, was that Mr. Dyer's phone was in Virginia, several hours away from the VVM robbery location, at about 90 minutes before the robbery. And then 25 minutes after the robbery, it was in D.C., where the other defendants' phones were at that time. And we also know that the defendants, I believe it was Mr. Reed, well, actually all three, Winston, Cannon, and Reed, their phones all hit the VVM robbery location within a half hour of that robbery location. So we have Mr. Dyer's phone in Virginia, he's from D.C., 90 minutes before, and then we have him with the other defendants who we can place their phones at the robbery location at the time of the robbery, we have him with them in D.C. 25 minutes later. So he did not testify, as Mr. Pafford would have you believe, that clearly the phone was not there. His testimony was, we only know there was only activity 90 minutes before and 20 minutes before. We do not know where Mr. Dyer's phone was. Excuse me? 90 minutes before and 20 minutes after. Correct, Your Honor. We do not know where, we believe the evidence showed he was there, so his phone was there. However, the cell site records cannot establish where that phone was at the time of the robbery. It is not what Mr. Pafford suggests that his testimony was, that it clearly was not there, it was somewhere else. There's no evidence of that. There's no evidence that Mr. Dyer was a participant in the VVM robbery other than the cell phone evidence. Your Honor, we have the fact that Mr. Dyer fits the physical description of the same robber and the other two robberies to a T. We have the fact that Mr. Dyer had contacts with all the other defendants previously that day, before the robbery, and then from 530 to 9 o'clock at night, there's no communications between the four defendants. We also have photographs taken after the robbery that show Mr. Dyer with large sums of money. After the VVM robbery or one of the others? It was after the shopper's robbery, Your Honor. But we do have Mr. Dyer in Virginia 90 minutes before. We have communications between Mr. Cannon and Mr. Dyer about he got to go in, text message, and then Mr. Dyer responds, already no. And the fact that the cell site data places him with the three other defendants who were at the robbery, before the robbery, 90 minutes before the robbery, and 25 minutes after the robbery, I think is compelling evidence that he too was there. And also, Your Honor, just the physical, when you view all three of these robberies on surveillance, you're struck with how similar they are and how similar these three robbers are. They have the same modus operandi. The tall, skinny one, which is Mr. Cannon, who wears skinny jeans and walks all hunched over, he comes in and he immediately goes for the big money. At the VVM, he went for the check-cashing establishment that was locked. In the Navy Federal Credit Union, he's the one in the yellow jacket who goes after the vault. He leaps the teller counter and goes to the vault room. And then the shoppers, he's the one that scales the wall into the manager's room, not once but twice. Mr. Dyer is also tall, and there's testimony from witnesses at all three locations that there were two tall robbers about six feet tall each. Mr. Dyer is a very tall man, approximately six feet tall, thicker than Mr. Cannon, who's the real thin one who scales everything, and much taller than Mr. Winston, Ms. Van Lowe's client. He's approximately 5'6", much darker complected, and has dreads. Two witnesses of the two different robberies saw dreads and that they could tell also that he was much darker than the other two. So I think when you consider it in totality, the similarities between the physical descriptions, the similarities between, you know, three men go in, there's a getaway driver in the car, and it's always a stolen Jeep. And you have all these communications before each of the robberies, and then no communications during the robberies. I think that's very compelling evidence, and it's evidence beyond a reasonable doubt that all four of these defendants were involved in all three robberies. One of the three alleged robbers had very distinctive jeans that showed up in cell phone pictures. Which one was that? Your Honor, that was Mr. Winston. He is the dark complected, short, much shorter than the other two. You see those distinctive jeans in the video surveillance of the Shopper's Food Warehouse and about five hours later the XM data on the phones showed photographs of him with Mr. Dyer and Mr. Cannon celebrating and also showed him and Mr. Dyer holding large sums of cash. With respect to the claim that VVM, there was no testimony that VVM was, that there was any money stolen from VVM, Your Honor, the testimony from Mr. Ramadan Hussain was he worked for VVM. He was there that night helping a customer, and you also see on the surveillance, and he testified to the fact that when the robbers came in and one went for the check cashing establishment, the other two forced him and the customer to the ground and took about $1,000 out of the cash register that he was working. And he said, yeah, there was another employee, there was another business, but that woman had left at 630. The robbery was at 8 o'clock. So there was more than enough evidence that VVM was in fact the victim of that robbery. With respect to the firearms traveling, Your Honor, these firearms, it's not a black gun that you see in the video. They are very distinctive. In the video and also the photographs that are part of the supplemental joint appendix, you see a very large gun with holes in it. You had a witness who testified that the gun that the short robber, dark-skinned robber with dreads, had holes on the gun and a long extended clip. Well, a gun that's very distinctive with holes and a long clip was found inside Mr. Cannon's house several hours later. And then also the other gun that Mr. Dyer was holding was a semi-automatic with a drum-style clip. I have been a prosecutor for nearly 20 years. I've never seen a drum-style clip. And that same gun with this drum-style clip was found two hours later inside Mr. Cannon's house. So clearly those guns did travel interstate. They went from the robbery in Virginia, the Navy Federal Credit Union, back to D.C. With respect to Mr. Cannon's argument that we just picked one phone number, Your Honor, that is the phone number that is listed in Winston's contacts as Cannon. That is the phone number that Dyer was calling before each of the robberies. That is the phone number that stopped working, according to Special Agent Horan, on December 13th. Mr. Cannon was the only defendant who was arrested without a phone. And with respect to the frequency of the calls, that there was no testimony of what a baseline, Your Honor, we were not establishing that these people were associated, that they were friends or associates because of the frequency of the calls. The evidence that was introduced regarding the phone calls between these individuals were on the days of the robbery, showing that there were contacts before the robberies but not during the robberies. That's what was the significance of that evidence, not that these were associates and that these were friends. And lastly, with respect to Mr. Horan's testimony, the court is right. Mr. Horan made it clear that he was testifying to the phones, not that these were the defendants, but he did testify that it is compelling evidence because we are so intertwined with our phones. We carry our phones everywhere. And he explained that he used the names in order to present complex evidence and that if he was wrong with the name associations, then that would be wrongly reflected in there. And Mr. Cannon and every defendant was free to argue, no, these phones are not linked to our clients. So there was, at the point in time when Mr. Horan testified, there was already some, all the evidence had already come in linking these four defendants to those phones that he analyzed. So if he had not testified, if he had not placed their names and just placed their numbers, it would be harmless error, Your Honor, because the jury could easily have relied on, you know, determined that these in fact were the four defendants just by looking at, I think it was Government Exhibit 18, 19, and 20. What's the strongest piece or pieces of evidence tying Mr. Reed to these crimes? Because no one, as far as I can recall, actually testified to seeing him at the scene of these robberies. Yes, Your Honor. Seeing someone fitting his description. Right. Well, with respect to Mr. Reed, first with the Navy Federal Credit Union robbery, within an hour he's apprehended with the three others. He's the one who starts running and the three follow when he's just asked for identification by the police. He is... Was the jury given a flight? No, actually, Your Honor, they were not. I believe that the defense objected to it and they were not, although the judge said, of course, that was something that they could consider, that they might consider, but a flight instruction was not given. Now, also the surveillance video at the Navy Federal Credit Union shows somebody is in the black Jeep because when the robbery is taking place you see the black Jeep moving. You also had several witnesses testify that they heard honking. And the black Jeep was abandoned about a mile away from the credit union, also in Virginia, and the ignition had been punched. When he's arrested, he has a screwdriver in his pocket. Also, there are four masks in the woods that are recovered in the woods. There are four people who run four masks. One of those masks has Mr. Reed's DNA on it.  It was determined he was the major contributor. Also, he's talking on the phone, Your Honor, when that's Officer Singleton's testimony is that Reed is talking on the phone when he's approaching him to apprehend him in the woods. He drops the phone. Then he's apprehended, and when FBI agents search the woods, they find a blue phone next to money. We get a search warrant for that phone. It shows that around the time that he's being arrested, around 11 in the morning, he's making a call to a person that's in his contact list as my baby girl. Within 20 minutes of their apprehension in the woods, a woman who identifies herself as Keith Reed's wife shows up at Anthony Cannon's house, pacing back and forth as if she wanted to get into the house, and then asks, Has my husband been arrested? That suggests that he has contacted her and has asked her to go to Mr. Cannon's house. And the reason he's asking her to go to Mr. Cannon's house is because that's where another $20,000 was to another GPS device, the guns, and more masks in the trash. Also, his phone is at Mr. Cannon's house before the robbery, and there's also calls between him and Dyer before the robbery where he says, Talk about the Navy Federal? Yes, sorry, Your Honor. The Navy Federal Credit Union. I'm still in the Navy Federal Credit Union, where he sends a text. Dyer sends a text to Mr. Dyer went to Reed and says, I'm out front, fool. And Mr. Reed responds, K. That's like at 530 in the morning, which would suggest that he's picking up Mr. Dyer. And then several hours later, the robbery takes place, and the cell site evidence showed they were all around Mr. Cannon's house before the robbery, and then, of course, within an hour of the robbery, they were arrested right outside Mr. Cannon's house. What about the other two? With respect to Mr. Reed, Your Honor? Yes, ma'am. Okay. Well, at Shopper's, there's also a getaway driver. There's evidence showing another Jeep parked outside of the Shopper's while the robbery is taking place. Mr. Reed's cell phone utilized a cell tower near Shopper's 10 minutes before the robbery. This is Sunday morning at 6 in the morning. At 620, 10 minutes before the robbery, his cell phone hits, and the person calling him at that time is my baby girl. So at the time that he's using the phone in the woods, he's contacting a person or they're contacting him, and it's the same person that's contacting him around the same time of this robbery, which the reason that's significant is because it shows it's not somebody else using the phone. And it also has numerous communications with Mr. Dyer and Mr. Cannon several hours that morning, and both Reed and Dyer's phones communicate between 423 and 520 that morning, but there are no communications between the defendants between 521 and 1231. And that was the day where you have photographs of Mr. Dyer and Mr. Winston with a lot of money celebrating at a club. The phones belonging to Mr. Reed show up near Mr. Cannon's house early that morning, and Mr. Cannon, who again fits the physical description of the man who scaled the wall, his phone also utilizes the shopper's around the same time that Reed's phone utilizes the shopper's cell site. With respect to VVM, his phone activates the cell tower right around the time of the robbery. The same cell site that surrounds VVM is activated by Mr. Reed's phone from 7 p.m. to 8.04 p.m., Your Honor. And the testimony of Mr. Donka was that there was somebody in that Jeep because he saw them enter the front passenger and the back. Nobody entered that car from the driver's side. Also, the cell site evidence placed Mr. Reed back in D.C. with the other defendants after the robbery. And there were, again, lots of communications between Mr. Reed and the other defendants that morning, or that day, not that morning, up until 5 o'clock. And then when the robbery occurs at 8 o'clock, from 530 to 8 o'clock, no communications. And if you look at Exhibit 45, you also see that there are a lot of, that all four of their cell phones are in Virginia together between 530 and 8 o'clock, which is the time of the robbery. And Mr. Reed's phone is at the robbery location or at the cell site that surrounds the robbery location at the time of the robbery. Well, Your Honors, I don't think I have anything else to add, but if you have any additional questions. Thank you very much. Thank you very much. Ms. Van Lowe, are you doing the rebuttal? Is somebody else going to participate? Yes. Oh, okay. I'm sorry. Yes, I'm doing the rebuttal. With respect to, they shook their heads very, very quickly saying no. Yeah. Okay. Well, I will say that it's very important for us to emphasize that there are three robberies here. And I think that it's very easy to take, and certainly the government would like to take the Navy Federal Credit Union robbery, start with that, and then work backwards. And, in fact, there are three robberies here. And it's important to look at the actual evidence with respect to each of those robberies and not simply imply that because four people did one robbery, the Navy Federal Credit Union, and they were caught, that means then they must have done all of the robberies. There is nothing distinct or special about four individuals, one staying in the car and three going in to rob an establishment. That is not, the government has relied heavily on that being some indication of modus operandi, and there is nothing unique about that. In this particular case, what the government went through before I came to the podium was a very extended list of cell site history information. They were, Ms. Bellows was specifically talking about cell phones. But as they, as their expert, Agent Horan, stated, the cell phone, we're testifying about cell phones, not about people. And so that's exactly what we need to hold the government to. That testimony, that argument was about cell phones. It was not about the actual individuals and their locations. And regardless of what Agent Horan testified about in terms of the societal norms of cell phones and people and how they're inextricably linked to one another, the reality of the situation is here we have cell phone cell site data. We do not have data about these individuals' whereabouts. The issue comes down to identity here, and I need to correct the record. Ms. Bellows at one point stated that witnesses identified Mr. Winston, or excuse me, identified individuals in two of the robberies as having dreadlocks. The first Navy Federal Credit Union, that witness testified that there was a potential dread and said that that was, he could see that underneath a cap that came down, and then there was a hood over that cap. That simply is not credible. During the Shopper's Food Warehouse robbery, the witness testified that she had seen what appeared to be dreadlocks, but again, these were all heads that were covered. We're never talking about hair that is exposed. So these were assumptions that these witnesses were making, not based upon what they actually saw, but just assumptions. There is a great deal made about this, the video surveillance. If your honors look at the actual exhibits that are listed, that are provided in the joint appendix, this is what you're looking at. These are, this is an entire black figure up top, and then down below there are white pants. There is nothing that would allow anybody looking at those pictures or looking at the surveillance to be able to identify anyone, because they are so, they were so undetailed that it's very difficult to be able to make the type of identification that the government's claiming that the jury made. When we're talking about fitting the description,  but here they were not required to simply find witness, find defendants, excuse me, that fit their descriptions. They were required to prove beyond a reasonable doubt that these four individuals actually committed these offenses. And saying that you have a six-foot black man and you have a, and he's tall and skinny, and then you have one that's slightly shorter than him and a little bit more stocky, those are not descriptions beyond a reasonable doubt of these particular individuals. You saw pictures in their phones, multiple individuals with dreadlocks, multiple individuals with dark skin that could easily have been interchangeable in these particular offenses. Finally, with respect to the guns, there's nothing distinctive about these guns either. The government specifically talked about gun clips. That is different from the gun, and here we have to prove that the gun traveled through interstate commerce, not the ammunition clip. There are, I don't know how many guns manufactured in this country, and the fact that one appears to be similar to the other is not sufficient. There has to be some type of identifying information. And again, the guns that the government talks about are found after the Navy Federal Credit Union robbery. That does not get to the VVM robbery and that does not get to the Shopper's Food Warehouse robbery and those guns. They had no testimony that the same guns were used throughout the three robberies, and they certainly didn't find the guns after each robbery. Those robberies took place not on the same day, not one day after the next, but there was substantial time between those. So we can't simply assume that the guns found in the house were the guns used throughout all three of the robberies. On behalf of the defendants, or the appellants, excuse me, we thank you for your consideration this morning. Thank you very much. I want to compliment all counsel on a well-prepared case, and I want to note on behalf of the court that Ms. Van Lowe, Mr. Woodward, Mr. Robertson, and Mr. Pafford, you are all court-appointed. The court extends its appreciation to you for agreeing to serve in that capacity. In this case, our system could not operate if we did not have the assistance of able counsel such as yourselves. So we'll come down and greet counsel and then move on to our next case. Thank you.
judges: G. Steven Agee, Albert Diaz, Henry F. Floyd